IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Builders Source Direct, | ) | |
| | ) | C.A. No.: 2:07-cv-531-PMD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| Cosco Logistics (Americas) Inc. | ) | |
| d/b/a IBS Logistics, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter was tried without a jury on Monday, May 12, 2008, and Tuesday, May 13, 2006. The court–having heard the arguments, read the briefs of counsel, and considered the evidence, including the testimony of live witnesses, deposition testimony, and exhibits–makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.    Plaintiff Builders Source Direct ("Plaintiff" or "BSD") is a building supply company, and Defendant Cosco Logistics (Americas), Inc. ("Defendant" or "CLA") is a logistics company that stores goods for hire.[1]

2.    From November of 2004 until June of 2006, BSD would purchase materials wholesale and have them delivered to a warehouse owned and operated by CLA in North Charleston, South Carolina (the "Warehouse").

3.    For materials coming into CLA's Warehouse, CLA prepared a dock receipt. The dock receipts had columns entitled "PCS," "COMMODITY," and "WEIGHT." It also had a place

---

[1]At various times during trial and in various documents filed with the court, Defendant has been referred to as Cosco, IBS, and CLA. All refer to the same entity, but this order will refer to Defendant as CLA.

for the date to be written and a place for the driver's signature. The purpose of the dock

receipt was to indicate what lumber entered CLA's Warehouse.

4.   The dock receipts generally did not indicate the section of the Warehouse where the lumber

was to be stored. CLA did not store BSD's lumber in any particular section of the

Warehouse. Instead, BSD's lumber was scattered throughout the Warehouse.

5.   When a dock receipt was prepared, a copy of that receipt was faxed to the customer. Lidiya

Kostornova, CLA's office manager, testified that dock receipts were prepared in carbon

form. One of the copies stayed in CLA's office, and another copy went to the customer.

Furthermore, a copy of the dock receipt was attached to the goods when they were placed

in CLA's warehouse.

6.   The back of the dock receipts also contained the following provisions:

IV.    LIMITATION OF LIABILITY AND WARRANTY
A.    Storage Liability Limited by Statutes. Company's liability for damage to
Purchaser's goods while in Storage is governed by SC Code 36-7-204 and is limited
to the lesser of (i) the actual value of the loss or damage incurred or (ii) an[] amount
not exceeding the amount of money actually paid by Purchaser to Company
hereunder. Unless otherwise specifically set forth on the Face Page, Company does
not carry insurance on the goods in its custody.
B.    Limited Warranty.    Company warrants that it will generally handle
Purchaser's goods at all times in accordance with such standards and procedures as
Company, in accordance with Company's best professional judgment, believes to be
appropriate under the circumstances. THE FOREGOING WARRANTY OF
COMPANY IS IN THE LIEU OF ALL OTHER WARRANTIES EXPRESS,
IMPLIED, OR STATUTORY INCLUDING BUT NOT LIMITED TO ANY
IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE AND IS IN LIEU OF ANY OTHER WARRANTY OR
OBLIGATION OF THE COMPANY.
C.    Remedies of Purchaser. The sole and exclusive remedy of Purchaser and
responsibility of Company for any breach of warranty or other breach of the
Agreement or any claim of negligence shall be, at Company's sole option, (i) to
correct any defective performance, or (ii) to refund any amounts paid by Purchaser
to Company. Company shall have no[] other liability or responsibility whatsoever
to anyone. IN NO EVENT SHALL COMPANY BE LIABLE TO ANYONE,

2

WHETHER IN CONTRACT, STRICT LIABILITY OR TORT, INCLUDING THE NEGLIGENCE OF COMPANY OR ITS EMPLOYEES, AGENTS OR REPRESENTATIVES, FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES OF ANY KIND OR CHARACTER, PURSUANT TO OR ARISING OUT OF ANY CONTRACT BETWEEN PARTIES. Company's maximum liability pursuant to, or arising out of, this Agreement shall be the contract price of any services improperly performed for non-conforming product. Liability for damage to persons arising out of this work shall be limited to the amount covered by the general comprehensive liability insurance carried by Company, if any. Liability for damage to Purchaser property shall be limited to actual cost, or $.50 (fifty cents) per pound, whichever is the lesser amount.

(Def.'s Ex. 5.)

7. The terms and conditions also contain a provision that states, "If Purchaser objects to this agreement or any of the Terms and Conditions contained herein, such objection must be made in writing to Company and must be received by Company within five (5) days from the Date Received."  (Def.'s Ex. 5.)

8. BSD did not send any objections to CLA regarding the Terms and Conditions on the back of the dock receipts.

9. In ruling on the parties' cross-motions for summary judgment, the court previously determined the terms and conditions on the back of the dock receipts apply to this action.

10. For outgoing materials, CLA would generate a "pickup/delivery order" document which was to reflect the number and type of materials that were leaving CLA's Warehouse. The pickup/delivery orders also had a place for the customer to sign and date the document.

11. BSD chose CLA as the Warehouse to store its lumber because CLA would allow BSD to break bundles of lumber.  BSD had difficulty finding a warehouse that would allow it to break bundles.

12. Although CLA allowed BSD to break bundles, CLA tracked BSD's inventory on a bundle-

by-bundle basis.  BSD did not agree to pay for the more costly piece-by-piece tracking of its inventory.

13.    Will Pennington was employed by BSD during all times relevant, and although he was employed by BSD, he spent a significant amount of his time at CLA's Warehouse. Pennington's duties while at the Warehouse included making sure BSD's shipments to various contractors were properly delivered.

14.    Pennington was not allowed to load BSD's lumber onto delivery trucks.  He did, however, sign for many of the outgoing shipments, and he was allowed to break bundles in the Warehouse.  Pennington also testified that he and one of CLA's employees would go around the Warehouse and that he would tell the CLA employee what needed to be loaded for BSD's outgoing shipment.

15.    Before Pennington or the carrier could leave CLA's Warehouse with the lumber, Kostornova performed a count of everything on the truck to ensure its accuracy.  Pennington then had to go to the guard gate at the Warehouse, and although the guards did not perform a count of the material on the truck, Pennington was required to have the appropriate paperwork before he was permitted to leave.

16.    When lumber was removed from the Warehouse, it was removed both in bundles and in pieces.  In some instances, pieces of lumber that were taken out but not used were returned to CLA's Warehouse.

17.    In approximately October of 2005, BSD went to the Warehouse to pick up some lumber that, according to its records, was in full supply in the Warehouse.  When neither BSD or CLA could locate this inventory, Robert Cook, president of BSD, sought a physical inventory of

4

BSD's lumber located at CLA's Warehouse.[2]

18.  Pennington performed this physical inventory on November 30, 2005, and one of CLA's employees accompanied him while he was performing the inventory.

19.  Dave McDonough, BSD's manager, compared Pennington's physical inventory to BSD's computer records and observed what he described as "huge discrepancies" in the counts.

20.  After Cook obtained a copy of the Pennington inventory, he compared that document to what BSD's computer system indicated inventory should be.  Cook testified there was a substantial discrepancy between the Pennington inventory and the inventory as stated by BSD's computer system.

21.  In December of 2005, Cook prepared a spreadsheet that reflected the difference between the actual physical inventory (the Pennington inventory) and the inventory as reflected in BSD's computer records.  Cook's spreadsheet indicates that 39,280 pieces of lumber were missing and that these pieces of lumber cost $301,900.40.

22.  Cook's spreadsheet listed a discrepancy in the following types of lumber: 2x4; 2x6; 2x2; 2x8; 2x10; and 2x12.  In the context of treated wood, Cook's spreadsheet listed a discrepancy with respect to 2x4s; 2x6s; 2x8s; 2x10s; 2x12s; 1x6s; 4x4s; 4x6s; and hand rails.  The spreadsheet also indicated which specific panels were allegedly missing.

23.  Cook did not mention this discrepancy to anyone at CLA, nor did McDonough.[3] McDonough did request an inventory from Kostornova, but CLA did not provide a copy of

---

[2]The lumber that could not be located was the supply of 2x8x12s, but Cook testified that these units were later found next to Ricky Martin's office.

[3]BSD did inform CLA of a potential inventory shortage in June of 2006, after BSD had removed all of its inventory from CLA's Warehouse.

its inventory records.[4]

24. On or about December 22, 2005, CLA sent a letter to BSD indicating that CLA's storage fees were increasing, effective January 2, to thirty dollars a bundle. McDonough testified that previous fees were five and ten dollars a bundle.

25. McDonough did not receive the letter (concerning the increase in CLA's storage rates) in his New York office until after BSD received its first January invoice. This invoice reflected the new charge of thirty dollars per bundle. Attached to that January invoice was a copy of Pennington's inventory.

26. The increase in storage rates meant that while BSD was previously billed approximately $600 per month for storage fees, that same storage was now being billed at approximately $4,000 per month.

27. On February 15, 2006, McDonough sent a letter via facsimile to Ricky G. Martin at CLA. This letter stated that McDonough was seeking an explanation as to why BSD's storage rates increased.

28. McDonough instructed BSD employees to not pay at least one of CLA's invoices at the new, higher rate until he approved such payment.

29. Although McDonough spoke with Hope August at CLA's headquarters, Ms. August indicated that Tim Carswell, assistant vice president for CLA, was responsible for setting the storage rates in the North Charleston Warehouse.

30. Carswell responded to McDonough's inquiries on March 16, 2006. He stated that contrary

_____

[4]Mr. Roth testified that BSD received an electronic printout of inventory from CLA when it received the last two billing statements, after CLA switched over to the new system.

to BSD's statement that it was only given ten days notice of the increase, the first invoice on the new rate was not generated until February.[5] With respect to the increase in fees for storage, Carswell indicated the new rates were the same as the rates for another customer with a similar commodity.

31.    Although CLA did let some of BSD's materials out, CLA began freezing BSD's inventory in January of 2006 as a result of the dispute over billing.

32.    At trial, defense counsel asked McDonough which issue he perceived to be the bigger one: the inventory discrepancy or the increase in storage rates. Although McDonough testified the discrepancy was the bigger issue, he did not contact CLA in an attempt to resolve that matter. He instead passed information along to his boss, Robert Cook.

33.    Mr. Les Roth was employed at BSD, and he was responsible for BSD's finances. He built a retail lumber yard system using Microsoft Access, and BSD began using that computer program on January 1, 2006.

34.    The record contains a printout of the inventory of BSD's lumber, according to Roth's Access program, as of November 26, 2007. Roth testified that inventory is still showing on this printout because it was never taken out of CLA's Warehouse.

35.    The Access printout indicates that the value at cost of the lumber allegedly missing is $294,997.00 and that the value at retail of this missing lumber is $378,073. (Pl.'s Ex. 3.)

36.    The value at cost is a weighted value specific to the particular product, so its value as a damages figure is tempered by that fact.

---

[5]Although Carswell indicated the new rate did not go in effect until February, BSD was billed on the new rate in January.

37.   Roth testified that the freezing of BSD's inventory had an impact on BSD's business in that BSD lost customers because BSD could not provide the lumber that customers requested. He further testified that the freezing of inventory and the inability to get financing made the business run out of money and ultimately fail.   However, on cross-examination, Roth indicated that the decision that BSD was unable to continue its operations was made prior to discovering the inventory discrepancy.  BSD never generated a profit during its existence.

38.   The final shipment of goods out of the Warehouse occurred on June 1, 2006.  Either that same day or a few days later, Carswell received a letter from Cook alleging an inventory discrepancy.

39.   Carswell testified that, in the course of preparing for trial, he worked with defense counsel to prepare an inventory reconciliation.  Carswell testified that he and defense counsel took all inbound documentation and compared it to all outbound documentation and discovered that it "looks like" CLA ended up with more of BSD's inventory coming in than going out. The inventory reconciliation prepared by CLA is Defendant's Exhibit 3.

40.   CLA thus admitted that there is an inventory shortage according to the documentation. Carswell testified, however, that he did not believe CLA had actually lost any of BSD's lumber.  He indicated the discrepancy could be the result of lost or incorrect paperwork.

41.   According to the inventory reconciliation prepared by Defendant, 547 bundles entered CLA's Warehouse and only 511 left CLA's Warehouse.  This reconciliation thus indicates that, at least according to the paperwork, 35 bundles of wood are missing.  The total number of "missing" pieces according to this reconciliation is 7,469.

42.   Plaintiff also prepared an inventory reconciliation in preparation for trial, and this

reconciliation is in the record as Plaintiff's Exhibit Number 72.[6]

43.     Although the inventory reconciliation prepared by CLA is based on all inbound and outbound documentation, regardless of whether the document came from Plaintiff or Defendant, Plaintiff indicated that Plaintiff's Exhibit 72 is a reconciliation based solely on CLA's records.

44.     For purposes of calculating the "missing" inventory, the Court uses Defendant's reconciliation as the starting point. The court has done so because while both reconciliations contain errors, Defendant's reconciliation contains fewer errors. Furthermore, Defendant's Exhibit 3 is the only exhibit in the record that has attempted to use all documentation in the record concerning inbound and outbound shipments. However, the court has thoroughly investigated and attempted to explain the differences between the two reconciliations in reaching its determination of what lumber is actually missing. If the court has not so noted, then every entry on Plaintiff's reconciliation was included in Defendant's reconciliation.

45.     Although Plaintiff urges this court not to consider documents that are not signed, the court concludes that even the unsigned documents are reliable in this case.

46.     The parties agree that at least a paperwork discrepancy exists. However, there are

_____

[6]Prior to trial, Defendant filed a Motion in Limine seeking to exclude certain evidence at trial. This motion stated, "The basis for this Motion is that, throughout the pendency of the case, Plaintiff's claims have been based upon allegations that a precise number (exactly 39,280 pieces) of specific categories of lumber were once stored at Defendant's warehouse but were allegedly never returned. An exhibit that was prepared by Plaintiff and attached to the Complaint itemized this exact number among each of the specific categories of lumber that were alleged to be at issue (i.e., 178 pieces of 2x6x8s)." (Def.'s Mot. in Limine at 1.) Defendant's motion was granted, and the court therefore considers Exhibit 72 to the extent that it provides a reconciliation of inventory with respect to that precise number (39,280 pieces) of the specific categories of lumber listed in the spreadsheet prepared by Cook.

substantial differences in the reconciliation provided by Defendant in Defendant's Exhibit 3 and the reconciliation provided by Plaintiff in Plaintiff's Exhibit 72.

47.    For example, Defendant's reconciliation with respect to 1x6x8s indicates that CLA received 14 bundles (or 3,036 pieces) of this size lumber and that 13 bundles (or 2,578 pieces) left the Warehouse. According to Defendant's reconciliation, then, it has "lost" on paper 1 bundle (or 458 pieces) of 1x6x8s.

Plaintiff's reconciliation shows that 12 bundles (or 3,960 pieces) of 1x6x8s entered the Warehouse and that 5 bundles (or 600 pieces) left the Warehouse. According to Plaintiff's reconciliation, CLA lost 7 bundles (or 2,640 pieces) of this size lumber.

Plaintiff takes issue with Defendant's reconciliation, asserting that Defendant counted improperly sized materials. Having carefully examined the records upon which Defendant's reconciliation is based, it is clear Defendant did count materials that were 5/4x6x8.[7] Defendant counted these materials, however, in both incoming and outgoing shipments. As noted, having so counted, Defendant's reconciliation indicates it "lost" 458 pieces of 1x6x8s.

The court concludes that CLA lost 2 bundles (or 480 pieces) of 1x6x8s. Although Plaintiff counts lumber from Dock Receipts 1706 and 1724 as incoming shipments for BSD, nothing on those two dock receipts indicates that shipment was

---

[7]Plaintiff asserts that by relying on materials, such as 5/4 inch materials, not contained on the Cook spreadsheet, CLA opened the door to review all the materials included in BSD's accounting. The court disagrees that CLA "opened the door" to such an inquiry and only examines those materials listed on the Cook spreadsheet.

for BSD.  It appears to the court that dock receipts for BSD were labeled "CBC," not "FAST."   All of the remaining data in Plaintiff's reconciliation with respect to 1x6x8s appears in Defendant's reconciliation.  If the court does not count any materials labeled 5/4x6x8, then 8 bundles (or 1,800 pieces) of 1x6x8s entered the Warehouse, and 6 bundles (or 1,320 pieces) left the Warehouse.  CLA thus lost 2 bundles (or 480 pieces) of 1x6x8s.[8]

48.    The court concludes CLA lost 418 pieces of 1x6x10s.  The court reaches this figure by not counting any lumber listed in the supporting documents as 5/4x6x10.  Excluding that lumber, the records indicate that 4 bundles (768 pieces) of 1x6x10s entered the Warehouse but an unknown number of bundles (350 pieces) of 1x6x10s left the Warehouse.  Although Plaintiff lists Dock Receipts 1706 and 1724 in its inventory reconciliation, the court concludes these dock receipts should not be considered because nothing on them indicates this lumber was delivered to CLA for BSD.

49.    The court concludes CLA lost 278 pieces of 1x6x12s.  The court reaches this figure by not counting any lumber listed in the supporting documents as 5/4x6x12.  Excluding that number, the records indicate that 2 bundles (512 pieces) of lumber entered the Warehouse but that only 1 bundle (161 pieces) left the Warehouse.  Although the difference between these figures is 1 bundle (351 pieces), the court determines that since no inbound documentation reflects the 1x6x14s on hand at the Warehouse on June 1, 2006, the amount

---

[8]The court notes this figure is not very different from the figure provided by Defendant's reconciliation, which indicated 1 bundle (or 458 pieces) of 1x6x8s were "lost."  Furthermore, while the court treats the counting of 5/4x6x8s as erroneous, it is not clear that doing so was in fact erroneous because Roth's inventory printout does not list that size.

of this lumber (73 pieces) should be credited to the figure for 1x6x12. Accordingly, the court determines 278 pieces of 1x6x12s are missing. Although Plaintiff relies on Dock Receipts 1706 and 1724 in its reconciliation, the court determines these two records should not be considered.

50. The parties agree, and the court finds, that CLA lost 184 pieces of 2x2x8s.

51. According to Defendant's reconciliation, CLA lost 17 bundles (4,998 pieces) of 2x4x93s. The court agrees with this calculation. The court finds Plaintiff's calculation that 45 bundles are missing is incorrect. In referring to Dock Receipt 1610, the court finds Plaintiff erroneously counted this figure as an inbound shipment for 2x4x93s. It also appears Plaintiff accidentally double-counted the outbound shipment associated with CLA 133.[9] Citing CLA 378, Plaintiff asserts that while Defendant properly accounted for shipments from Brunswick Valley Timber and Idaho Timber, Defendant failed to account for a shipment of 18 bundles (5,292 pieces) of 2x4x93s. The court rejects this argument, as it appears Plaintiff is attempting to double count an incoming shipment.[10] Plaintiff also takes issue with Defendant's outbound shipment of 2x4x93s on or about December 28, 2004. Plaintiff asserts Defendant erroneously relied on the same "arriving" or incoming document to indicate the materials were leaving. Examining CLA 411, however, it is clear that 9 units of 2x4x93s did in fact arrive at CLA's Warehouse on December 29, 2004, and Defendant

[9]References to "CLA 133" and the like are references to the Bates numbers on the bottom of the documents in evidence.

[10]CLA 378 appears to be a bill of lading from Arrow Forest Products for 18 bundles of 2x4x93s. Defendant's documentation does come from Brunswick Valley Timber and Idaho Timber Corporation. However, the document from Idaho Timber Corporation indicates the lumber was sold to Arrow Forest Products and shipped to CLA.

has also produced documentation that those 9 bundles also left CLA's Warehouse. The court therefore concludes CLA lost 17 bundles (or 4,998 pieces) of 2x4x93s.

52.    Both reconciliations indicate that CLA lost 6 bundles of 2x4x105s, but the figures used to compute that number are different. The court concludes CLA lost 9 bundles (2,490 pieces) of 2x4x105s. Looking at Defendant's Exhibit 2-6 and 2-8, it is unclear why the outbound shipment should be counted twice for what appears to be one shipping document. The court also concludes that one bundle Defendant did not account for entered CLA's Warehouse on approximately December 28, 2004. Making these adjustments to Defendant's calculation, the total lost is 9 bundles (2,490 pieces).[11]

53.    Defendant's reconciliation for 2x4x117s indicates that 7 bundles (1,990 pieces) entered CLA's Warehouse and that 14 bundles (4,014 pieces) left the Warehouse. According to CLA's calculation then, 7 more bundles (2,024 pieces) left the Warehouse than ever entered it. BSD calculates that 6 more bundles of 2x4x117s left the Warehouse than ever entered it. The court agrees with Defendant's calculation and concludes that 7 more bundles (2,024 pieces) of 2x4x117s left the Warehouse than ever entered it.[12]

54.    With respect to 2x4x8s, the reconciliations match with the exception of one outbound shipment of 2 bundles (384 pieces) on or about January 18, 2005. The court therefore agrees with Defendant that CLA lost 4 bundles (816 pieces) of 2x4x8s.

55.    The court concludes that 1.6 bundles (501 pieces) more of 2x4x10s left CLA's Warehouse

---

[11]Plaintiff's reconciliation with respect to 2x4x105s is very similar to Defendant's. It appears that only one bundle (as opposed to the three listed) left the Warehouse on February 24, 2005, and the reconciliation has two entries for August 4, 2005 that appear to be double counted.

[12]The court will address this impossibility later in the Order.

than entered it.  According to Defendant's reconciliation, 3 more bundles (795 pieces) left the Warehouse than entered it.  The court concluded an adjustment was appropriate with respect to Defendant's Exhibit 2-81, as it could be determined from that exhibit only that one bundle left the Warehouse.

56.    The court concludes that CLA lost 6.1 bundles (1,528 pieces) of 2x4x12s.  According to Defendant's calculation, 5 bundles (1,234 pieces) of 2x4x12s were lost.  However, the court concludes that it is necessary to make an upward adjustment per CLA 297.

57.    The court concludes CLA lost 3 bundles (882 pieces) of 2x4x14s.  Although Defendant's calculation includes an outbound shipment of 2 bundles (588 pieces), the court does not count this figure (in Defendant's Exhibit 2-81) as the court is unable to substantiate the shipment.

58.    The court concludes CLA lost 1.7 bundles (260 pieces) of 2x4x16s.  According to Defendant's calculation, 1 bundle (602 pieces) more of 2x4x16s left the Warehouse than came into it, but the court concludes several adjustments must be made to this figure.  First, with respect to Defendant's Exhibit 2-81, the court concludes the documentation only substantiates an outbound shipment of 1 bundle (294 pieces).  The court also concludes that three adjustments are necessary to the inbound figure: (1) adding 1 bundle (294 pieces) per CLA 297; (2) per CLA 650, changing the shipment from .1 bundle to 1 bundle; and (3) adding 1 bundle (294 pieces) per CLA 255.  An outbound shipment of 1 bundle (294 pieces) is warranted per CLA 1207.

59.    The court concludes CLA lost 5 bundles (800 pieces) of 2x6x105s.  Plaintiff and Defendant agree on this calculation, once the double-counted entry concerning CLA 133 is removed

14

from Plaintiff's count.

60.    The court concludes that 3 bundles (683 pieces) more of 2x6x117s left CLA's Warehouse than went in.  Defendant calculated that figure at 4 bundles (756 pieces) more but erroneously listed the entry with respect to Defendant's Exhibit 2-65 as four bundles outbound as opposed to correctly listing it as three bundles outbound.  The figure determined by the court is in line with Plaintiff's calculation as well, with the exception of the Plaintiff's omission of an outbound shipment of 3 bundles (567 pieces) on April 18, 2005.

61.    The court concludes that 1 bundle more (138 pieces) of 2x6x8s left CLA's Warehouse than went in.  The parties agree on this figure.

62.    The court concludes that CLA lost 0 bundles (64 pieces) of 2x6x10s.  According to Defendant's reconciliation, it lost 0 bundles (64 pieces) of 2x6x10s.  Plaintiff's reconciliation indicates that 1 bundle more of 2x6x10s left the Warehouse than entered it. The discrepancy arises with respect to CLA 0122.  Although Plaintiff counts two outgoing bundles, the court concludes only one left, as only one entered the Warehouse per Dock Receipt 1725.

63.    The court concludes CLA lost 0 bundles (33 pieces) of 2x6x12s.  Defendant's reconciliation indicates no bundles are missing, and Plaintiff's reconciliation indicates 0.66 bundles are missing.  The court concludes Defendant's calculation is correct, with the exception of the outbound entry concerning Defendant's Exhibit 2-12.  The court concludes that outbound shipment is for 1 bundle (160 pieces) of 2x6x12s.

64.    The court concludes CLA lost 4 bundles (573 pieces) of 2x6x14s.  The court concludes Plaintiff's calculation is understated but that Defendant's calculation is correct.

15

65.    The court concludes CLA lost 2 bundles (126 pieces) of 2x6x16s.    Defendant's reconciliation indicates 0 bundles are missing but that 252 pieces more left the Warehouse than went into it.  The court makes two adjustments to this figure.  First, per CLA 297, the court adds 1 bundle (189 pieces).  Second, per CLA 255, the court adds 1 bundle (189 pieces).

66.    The court concludes that 5 bundles (550 pieces) more of 2x8x10s left the Warehouse than went into it.  Defendant's reconciliation indicates 6 bundles (670 pieces) more of 2x8x10s left the Warehouse than entered it.  The court adjusts this figure, concluding that there is only one outbound shipment of 1 bundle (120 pieces) with respect to Defendant's Exhibit 2-17.  Although Plaintiff lists an inbound shipment of 1 bundle on November 17, 2005, the court does not count this bundle as it is cannot conclude the underlying document represents an inbound shipment.

67.    The court concludes that 2.25 bundles (238 pieces) more of 2x8x12s left the Warehouse than entered it.  Defendant's figure is correct.

68.    The court concludes that 1 bundle (132 pieces) more of 2x8x14s left the Warehouse than entered it.  Defendant's figure is correct.

69.    The court concludes CLA lost 6 bundles (760 pieces) of 2x8x16s.    Defendant's reconciliation indicates that it lost 2.7 bundles (640 pieces) of 2x8x16s.  The court makes several adjustments to that figure.  With respect to Defendant's Exhibits 1-47 and 1-49, the court counts both those incoming shipments as one bundle.  Defendant counts Defendant's Exhibit 2-29 as 2 bundles (192 pieces) outgoing, but the court concludes it is 1 bundle (192 pieces) outgoing.  In its reconciliation, Plaintiff counted an incoming shipment of 1 bundle

16

per CLA 255, and because the court agrees that this document reflects an incoming shipment, the court counts this as an incoming shipment of 1 bundle (120 pieces) of 2x8x16s.

70.  The parties agree, and the court concludes, that there are no bundles of 2x8x18s missing.

71.  The parties agree, and the court concludes, that there are no bundles of 2x8x20s missing.

72.  The court concludes that CLA lost no 2x8x22s. Defendant's calculation is correct, and Plaintiff's calculation omits the outbound shipment referenced in Defendant's Exhibit 2-14.

73.  The court concludes that CLA lost 0.7 bundles (147 pieces) of 2x8x24s. Defendant's calculation indicated it lost 1.7 bundles (294 pieces) of this size lumber, but the court concludes the entry associated with Defendant's Exhibit 1-26 is erroneous.

74.  The court concludes that 3 bundles (40 pieces) more of 2x10x10s left CLA's Warehouse than entered it. Defendant's reconciliation indicates that 0 bundles (60 pieces) are missing, but Defendant did not account for the 3 bundles (100 pieces) left in inventory per CLA 1205.

75.  The court concludes that 0.7 bundles (6 pieces) more of 2x10x12s left CLA's Warehouse than entered it. Defendant's reconciliation indicates 0 bundles (6 pieces) more left the Warehouse than entered it. The difference between the calculation made by the court and by the Defendant is that the court treats the outbound shipment associated with Defendant's Exhibit 2-59 to be an outbound shipment of 1 bundle.

76.  The court concludes that 2.2 bundles (130 pieces) more of 2x10x14s left CLA's Warehouse than entered it. Defendant's reconciliation indicates 1.3 bundles (130 pieces) more left CLA's Warehouse than entered it. The court has adjusted Defendant's figure, concluding that the outbound shipment associated with Defendant's Exhibit 2-59 is 1 bundle.

77.    The court concludes CLA lost 0 bundles (46 pieces) of 2x10x16.  Defendant's figure is correct.

78.    The parties agree, and the court finds, that CLA lost no 2x10x18s.

79.    The court concludes that 1 bundle (85 pieces) more of 2x10x20s left CLA's Warehouse than entered it.  The court agrees with Defendant's calculation; Plaintiff's calculation omitted the outbound documentation associated with Defendant's Exhibit 2-44.

80.    The parties agree, and the court finds, that CLA lost no 2x10x22s.

81.    The court concludes CLA lost no 2x10x24s.  Defendant's calculation is correct; Plaintiff's calculation omits the outbound shipment of 2x10x24s associated with Defendant's Exhibit 2-14.

82.    The court concludes CLA lost 1.75 bundles (57 pieces) of 2x12x10s.  Both parties agree that 57 pieces were lost; the only difference in the two reconciliations is the calculation of the bundle loss.

83.    The court concludes 3 bundles more (132 pieces) of 2x12x12s left CLA's Warehouse than went into it.  Defendant's reconciliation indicates that 3 bundles (180 pieces) more left the Warehouse than entered it.  The court, however, concludes that the incoming shipment referenced in Defendant's Exhibit 1-52 is actually an incoming shipment of 2 bundles (128 pieces).

84.    The court concludes that CLA lost 3 bundles (172 pieces) of 2x12x14s.  Defendant's calculation is correct.

85.    The court concludes that CLA lost 7.8 bundles (424 pieces) of 2x12x16s.  Defendant's calculation indicates it lost 7.8 bundles (440 pieces) of this size lumber.  The court makes

two adjustments to this figure.  First, one of the two entries associated with Defendant's Exhibit 2-11 is not counted, as the supporting documentation only calls for one outbound shipment of 1 bundle (64 pieces) of 2x12x16s.  Second, the court concludes Defendant did not count the 2x12x16s left in inventory as an outbound shipment.  (*See* CLA 1205.)[13]

86.    The court concludes CLA lost 5 bundles (374 pieces) of 2x12x18s.  Defendant's calculation indicates it lost 0 bundles (0 pieces) of this size lumber.  However, the court adjusts this figure with an inbound shipment of 6 bundles (384 pieces) per CLA 713 as well as an outbound shipment of 1 bundle (10 pieces) that was left in inventory.[14]

87.    The court concludes that 0.5 bundles (14 pieces) more of 2x12x20s left CLA's Warehouse than entered it.  Defendant's calculation is correct.

88.    The parties agree, and the court finds, that CLA lost 0 bundles (0 pieces) of 4x4x8s.

89.    The court concludes CLA lost 0 bundles (2 pieces) of 4x4x12s.  Defendant's calculation is correct.  Plaintiff's reconciliation indicates CLA lost 0.67 bundles of this size lumber, but Plaintiff's calculation includes several errors.  First, both of Plaintiff's incoming shipments of 4x4x12s have incorrect piece counts, as is evident upon examining the total piece count associated with the inbound shipment referenced.  Second, while Plaintiff references CLA 203 as associated with an outbound shipment of 4x4x12s, that document refers to 4x4x10s.

90.    The parties agree, and the court concludes, that CLA lost 0 bundles (0 pieces) of 4x4x16s.

---

[13]CLA 1205 appears to indicate that 8 bundles (80 pieces) of 2x12x16s were left in inventory.  However, the court concludes that 1 bundle (80 pieces) of this size lumber is the correct figure.

[14]Although the inventory list actually states 3x12x18, the court concludes the "3" is a typo.

91.     The court concludes CLA lost 22.6 bundles (1,696 pieces) of 7/16 inch paneling. Defendant's reconciliation indicates it lost 8.6 bundles (678 pieces) of this size paneling. The court makes several adjustments to Defendant's figure.  First, the court concludes the outbound shipment associated with Defendant's Exhibit 2-6 was for 3 bundles (68 pieces). Second, the court concludes the outbound shipment associated with Defendant's Exhibit 2-49 does not refer to 7/16 inch paneling.  The court concludes the inbound shipment of 3 bundles (204 pieces) associated with CLA 420 must be counted as an inbound shipment of 7/16 inch paneling.  The following are also counted as inbound shipments: (a) 1 bundle (47 pieces) per CLA 688; (b) 1 bundle (47 pieces) per CLA 837; and (c) 1 bundle (40 pieces) per CLA 837.

92.     The court concludes that 2.2 bundles (156 pieces) more of ½ inch paneling left CLA's Warehouse than entered it.  Defendant's reconciliation indicates that 5.2 bundles (336 pieces) more of this size paneling left the Warehouse than entered it.  The court has adjusted that figure with respect to Defendant's Exhibit 2-57, concluding the documents in that exhibit do not refer to ½ inch paneling.

93.     The court concludes 42 pieces more of 3/4 OSB TG, also known as 3/4 T&G Plywood, left CLA's Warehouse than entered it.  Defendant's calculation is correct, with the exception of the entry associated with Defendant's Exhibit 2-33.  The court concludes that outbound shipment was for 1 bundle (50 pieces).

94.     The court concludes CLA lost 14 bundles (690 pieces) of other 3/4 inch paneling. Defendant counted an outgoing shipment associated with Defendant's Exhibit 2-49, but that exhibit refers to lumber of a different size.  Defendant also counted an outgoing shipment associated

with Defendant's Exhibit 2-81, but the court concludes no 3/4 inch paneling appears on the documents associated with that outgoing shipment.

95.     The court concludes CLA lost no handrails.  Defendant's calculation is correct.

96.     Although CLA admits only that it "lost" the lumber at issue on paper, the court concludes that such lumber was actually lost.

97.     The following is a chart of the totals of missing lumber:

| TYPE OF LUMBER | AMOUNT MISSING (PIECES) |
|---|---|
| 1x6 | 1,176 |
| 2x2 | 184 |
| 2x4 | 8,449 |
| 2x6 | 775 |
| 2x8 | (13) |
| 2x10 | (215) |
| 2x12 | 881 |
| 4x4 | 2 |
| 7/16 paneling | 1,696 |
| ½ paneling | (156) |
| 3/4 OSB TG | (42) |
| 3/4 paneling | 690 |

98.     The court finds CLA's loss of lumber was not willful, intentional, or reckless.  The preponderance of the evidence does not support a finding of willfulness, intent, or recklessness.

99.     The court's reconciliation indicates that, with respect to certain pieces of lumber, more left the Warehouse than ever entered it.  Such an occurrence is impossible, unless CLA delivered

other customers' lumber to BSD. Although these negative numbers are likely the result of improper classification of lumber or other paperwork errors, the court does not include the negative numbers in the calculation of damages.

100.    The court will assess damages on a per-piece basis.

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over the claims alleged herein under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and the claims are between citizens of different states.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.    Defendant maintains sufficient contacts in South Carolina for the exercise of personal jurisdiction over it by this court.

4.    A bailor can make out a *prima facie* case of a bailee's negligence by showing that the bailor delivered the goods to the bailee in good condition and that the bailee delivered the goods in damaged condition or did not return the goods at all. *See Fleetguard, Inc. v. Dixie Box & Crating Co.*, 314 S.C. 471, 471, 445 S.E.2d 459, 460 (Ct. App. 1994); *see also Gilland v. Peter's Dry Cleaning Co.*, 195 S.C. 417, 11 S.E.2d 857, 858 (1940).

5.    Indeed,

in warehouse bailments, when the bailor shows that the bailee has not returned the property, the subject of the bailment, or that the property has been lost by theft or fire, or that it has been returned in a damaged condition, such bailor has made out a prima facie case, and the duty is then shifted to the bailee to show that he has used ordinary care in the storage and safe keeping of the property. From these facts, coupled with any testimony on the subject the bailor may introduce, it is for the jury to say whether the bailee has been negligent, that is failed to use ordinary care.

*Albergotti v. Dixie Produce Co.*, 202 S.C. 357, 25 S.E.2d 156, 158-59 (1943); *see*

22

*also Hadfield v. Gilchrist*, 343 S.C. 88, 100, 538 S.E.2d 268, 274 (Ct. App. 2000).

6.  The court concludes Plaintiff has established a prima facie case of negligence because it proved by a preponderance of the evidence that it delivered lumber into CLA's possession and that CLA did not return that lumber.  The court also concludes that CLA has failed to show that it used ordinary care in the storage and safekeeping of the lumber.  At times, CLA did not properly document incoming and outgoing shipments.  For example, the record contains notations of outgoing shipments on some dock receipts, and by virtue of the fact that negative numbers exist in the court's inventory reconciliation, it appears that some documentation was either not prepared or was not properly preserved in CLA's files.  Signatures were not always obtained, and the description of the lumber on the dock receipts and pickup orders is not always sufficiently descriptive to conclusively identify which lumber (or the amount of lumber) the document references.  CLA also failed to provide a computer printout of BSD's inventory to BSD in a timely manner despite numerous requests and in fact even relied on a physical inventory performed by one of BSD's employees for purposes of billing BSD.  Plaintiff is thus entitled to recover for the lumber that CLA lost.

7.  "[I]t is not necessary that damages be calculable to an absolute mathematical certainty." *S.C. Nat'l Bank v. Lumbermens Mut. Cas. Co.*, 526 F. Supp. 94, 96 (D.S.C. 1981) (citing *Haltiwanger v. Barr*, 258 S.C. 27, 186 S.E.2d 819 (1972)).  "It is sufficient that the evidence presented enables the Court to determine the damages with reasonable certainty or accuracy." *Id*. (citing *Gray v. S. Facilities, Inc.*, 256 S.C. 558, 183 S.E.2d 438 (1971)); *cf. Petty v. Weyerhaeuser Co.*, 288 S.C. 349, 355, 342 S.E.2d 611, 615 (Ct. App. 1986) (stating, albeit in the context of damages for prospective profits, that "[b]y certainty it is meant that

the damages may not be left to mere speculation or conjecture").

8.  The Access printout is not hearsay because these records were kept in the course of a

regularly conducted business activity. *See* Fed. R. Evid. 803(6). Indeed, Mr. Roth testified

that he relied on these figures in preparing BSD's tax documentation. Defendant cites

*Western Insulation, LP v. Moore*, 242 Fed. App'x 112 (4th Cir. 2007) for the proposition that

the business record exception does not apply because BSD made no showing that the

information obtained from its suppliers was obtained from the suppliers' business records.

The exhibit at issue in *Western Insulation* was created from the plaintiff's bid logs, and it

contained information concerning jobs for which the plaintiff tendered bids as well as the

company that received the job. *Western Insulation*, 242 Fed. App'x at 120. The information

in the bid logs concerning which companies received the jobs was obtained from customers

through specific inquiries by plaintiff's sales representatives, who entered the information

on bid logs and then transmitted the information to their branch managers. *Id*. at 121. The

court stated that even if Federal Rule of Evidence 803(6) "addresses the first level of

hearsay–the fact that the bid logs were out-of-court declarations–it does not address the fact

that the information in the bid logs was based on the out-of-court statements of agents of

Western's customers." *Id*. There is no such hearsay problem in the case *sub judice*, and the

court therefore concludes the Access printout is not hearsay under Federal Rule of Evidence

803(6).

9.  Pursuant to Rule 1006 of the Federal Rules of Evidence, "[t]he contents of voluminous

writings, recordings, or photographs which cannot conveniently be examined in court may

be presented in the form of a chart, summary, or calculation. The originals, or duplicates,

shall be made available for examination or copying, or both, by other parties at reasonable time and place." Defendant argues this rule prevents the court from considering the cost data on the Access printout because Plaintiff has not produced the underlying invoices from those who sold the lumber to it. As a preliminary matter, Plaintiff's Exhibit 3 does not purport to be a summary of documentation too voluminous to be presented at trial. Mr. Roth testified that he may have thrown invoices away for lumber BSD purchased once the purchase had been entered into the Access program. However, the court concludes both parties produced all documentation available to them such that even if considered a summary, Plaintiff produced the underlying documentation.

Perhaps the heart of Defendant's objection to the admissibility of this evidence is that the cost of the lumber as demonstrated by the underlying documentation does not always match the cost as demonstrated by the Access printout. Defendant produced some demonstrative evidence from which the court could conclude the cost as stated in the Access printout is overstated, but Plaintiff likewise produced some demonstrative evidence from which the court could conclude the cost as stated in the Access printout is reasonably accurate. The court concludes the cost of the lumber as stated in Plaintiff's Exhibit 3, the Access printout, is a sufficiently reliable statement of the cost. Plaintiff relied on the cost as stated in this printout in preparing its tax documents, and Defendant did not suggest another method for the court to use in calculating damages.

10. The court will therefore compute damages based on the only cost data available to it. The following chart contains the type of lumber missing, the amount, the cost per piece, and the

25

total amount of damages per type of lumber. The "cost per piece" is an average of the cost

for like materials listed on Plaintiff's Exhibit 3. For example, the cost for 1x6 materials is

an average of the cost for 1x6x10 ($3.19), 1x6x12 ($4.61), and 1x6x8 ($2.45).

| **Type of Lumber** | **Pieces Lost** | **Cost Per Piece** | **Total Damages** |
|---|---|---|---|
| 1x6 | 1,176 | $3.42 | $4,021.92 |
| 2x2 | 184 | $1.60 | $294.40 |
| 2x4 | 8,449 | $3.36 | $28,388.64 |
| 2x6 | 775 | $4.96 | $3,844.00 |
| 2x12 | 881 | $19.61 | $17,276.41 |
| 4x4 | 2 | $12.89 | $25.78 |
| 7/16 | 1,696 | $11.71 | $19,860.16 |
| 3/4 | 690 | $25.61 | $17,670.90 |
| **TOTAL** | | | $91,382.21 |

11.    The court concludes $91,382.21 is reasonable compensation for the lost lumber.

12.    Although Plaintiff attempted to show at trial that it is entitled to damages above and beyond

the cost of the missing lumber, the court concludes Plaintiff is entitled to no further

compensation. As noted above, the terms and conditions applicable to the case *sub judice*

state in part, "Company's liability for damage to Purchaser's goods while in Storage is

governed by SC Code 36-7-204 and is limited to the lesser of (i) the actual value of the loss

or damage incurred or (ii) an[] amount not exceeding the amount of money actually paid by

Purchaser to Company hereunder." (Def.'s Ex. 5.) Defendant has not attempted to limit its

liability to the amount of money actually paid by BSD to CLA and the court therefore

26

concludes that liability is limited to the actual value of the loss, $91,382.21.[15]

13.     The terms and conditions prohibit the recovery of any incidental, consequential, special, or

indirect damages.  Even without this limitation, however, the court concludes that Plaintiff

is not entitled to recover lost profits.  There was evidence at trial that Plaintiff's business

failed even before the inventory discrepancy was discovered, and there was evidence that

Plaintiff liquidated some of its lumber at half the cost.  Furthermore, BSD did not turn a

---

[15]Plaintiff argues CLA cannot limit its liability under a theory of negligence for several reasons, many of which were addressed in the Order on the parties cross-motions for summary judgment.  (*See* Order dated March 25, 2008; Doc. No. [72].)  The court will not reiterate those reasons here but will address the new arguments.  Plaintiff first argues the terms and conditions are only applicable as to the storage of the goods described on the Face Page and that since CLA failed to provide evidence linking the lumber lost to specific dock receipts, liability cannot be limited.  The court rejects that argument, as the relevant terms and conditions on the back of *all* dock receipts were identical.  Plaintiff next argues that CLA cannot limit its liability to the fees paid by BSD, but CLA has not attempted to do so.  In much the same fashion, Plaintiff argues CLA cannot limit its liability according to the weight of the lumber, but the court need not address the argument as CLA does not attempt to limit its liability according to weight.

Plaintiff further argues CLA's liability should not be limited because the limitation provision states that CLA's liability "for **damage** to Purchaser's goods" is governed by South Carolina Code § 36-7-204 and that the limitation of liability on the dock receipts refers only to damage, not the negligent loss of goods.  South Carolina Code § 36-7-204(2) states in part, "Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage . . ."  The statute thus clearly contemplates that damages may be limited for the loss of goods.  *See Phillips Bros. v. Locust Indus., Inc.*, 760 F.2d 523, 526 (4th Cir. 1985) ("Section 7-204(2) of the Commercial Law Code of Maryland allows a bailee to limit the amount of his liability for lost or damaged goods."); *see also Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 552 (6th Cir. 1995) (noting that U.C.C. § 7-204(2) "authorizes the inclusion in warehouse receipts of contract terms limiting liability in case of loss or damage").  Plaintiff argues that because the limitation provision refers to CLA's "liability for *damage* to Purchaser's goods" instead of CLA's liability for "*damage or loss*," the limitation does not apply in the case of lost goods.  The court concludes such an interpretation ignores that the provision indicates it is governed by South Carolina Code § 36-7-204, which clearly contemplates limiting liability for lost goods, and that the provision states "liability for damage . . . is limited to <u>the lesser of</u> (i) the actual value of the *loss or damage* incurred or (ii) an[] amount not exceeding the amount of money paid by Purchaser to Company hereunder." (Def.'s Ex. 5 (emphasis added).)

27

profit during its existence.  The court therefore concludes that Plaintiff did not establish entitlement to lost profits.

14.  In the context of a negligence claim, an award of punitive damages is proper only when that negligence is wilful, wanton, or reckless.  *Scott v. Porter*, 340 S.C. 158, 172, 530 S.E.2d 389, 396 (Ct. App. 2000); *see also Wise v. Broadway*, 315 S.C. 273, 277, 433 S.E.2d 857, 859 (1993) (concluding the lower court erred in removing the consideration of punitive damages from the jury when there was evidence of a statutory violation because violation of the statute "would be negligence *per se* and evidence of recklessness from which the jury could find that the respondent was guilty of reckless conduct, and, consequently, liable for punitive damages"); *Carter v. R.L Jordan Oil Co.*, 301 S.C. 84, 86, 390 S.E.2d 367, 368 (Ct. App. 1990) ("Evidence of simple negligence alone will not support an award of punitive damages.").  Because the court concluded CLA was not wilful, wanton, or reckless, the court concludes BSD is not entitled to an award of punitive damages.

15.  Under South Carolina law, "[c]onversion is the unauthorized assumption and exercise of the rights of ownership over goods or personal chattels belonging to another, to the alteration of their condition or to the exclusion of the rights of the owner." *Walters v. Canal Ins. Co.*, 294 S.C. 150, 152, 363 S.E.2d 120, 122 (Ct. App. 1987) (citing *Green v. Waidner*, 284 S.C. 35, 324 S.E.2d 331 (Ct. App. 1984)).  It has also been stated that "'any use, or disposition, of a chattel, without the consent of the owner, and inconsistent with his rights, is a conversion'." *Powell v. A.K. Brown Motor Co.*, 200 S.C. 75, 20 S.E.2d 636, 637 (1942) (quoting *Hutchinson v. Bobo*, 17 S.C.L. (1 Bail.) 546 (1830)).

16.  In order to establish a cause of action for conversion, a plaintiff must prove (1) an interest

28

by the plaintiff in the thing converted; (2) the defendant converted the property to his or her

own use; and (3) the use was without the plaintiff's permission.  *See Crane v. Citicorp Nat'l

Servs., Inc.*, 313 S.C. 70, 437 S.E.2d 50 (1993), *superseded by statute on other grounds*; *see

also Newman Grill Sys., LLC v. Ducane Gas Grills, Inc.* (*In re Ducane Gas Grills, Inc.*), 320

B.R. 324, 339 (Bankr. D.S.C. 2004).

17.     In its Order on the parties cross-motions for summary judgment, the court stated,

> In principle, the mere negligence of a bailee in the care of property does not
> amount to a conversion.  Nevertheless, where a bailee fails to use that degree of care
> which the circumstances of the case demand of him or her, he or she is liable to the
> bailor in an action of conversion for the consequent loss of the property or for its full
> value where it was rendered worthless.  If a bailee causes or permits bailed property
> to be destroyed or damaged, this constitutes a conversion of the property to the
> bailee's own use.  8 C.J.S. *Bailments* § 41.  *But see Refrigeration Sales Co. v.
> Mitchell-Jackson, Inc.*, 770 F.2d 98, 101 (7th Cir. 1985) (noting, in an opinion
> written by Judge Posner, that many cases hold an unexplained disappearance creates
> a presumption merely of negligence, and not of conversion).

(Order at 22.)  The Defendant moved for summary judgment on the conversion claim

on the grounds that there was no evidence from which a reasonable finder of fact

could conclude that the lumber was taken, lost, stolen, given away, or destroyed, but

the court disagreed.

18.     To the extent the court previously concluded that actions for negligence and conversion in

the context of a bailment are indistinguishable, the court now concludes such a statement

was erroneous.  If a bailee simply loses the property that is the subject of the bailment, the

bailee is not liable for conversion.  *See* RESTATEMENT (SECOND) OF TORTS § 224 ("One who

does not intentionally exercise dominion or control over a chattel is not liable for a

conversion even though his act or omission is negligent."); *id*. cmt. b. & illus. 1 ("[N]or is

a bailee a converter when he merely fails to use proper care in keeping the goods entrusted

to him, so that they are lost or stolen."); *see also* U.C.C. § 7-204 cmt. 4 ("As under former Section 7-204(2), subsection (b) provides that a limitation of damages is ineffective if the warehouse has converted the goods to its own use. A mere failure to redeliver the goods is not conversion to the warehouse's own use."); *cf. Refrigeration Sales Co.*, 770 F.2d at 101 ("If Mr. Jackson had in a rage smashed one of [plaintiff's] cylinders . . . he would be guilty of conversion. But no one suggests he did anything like that; it appears that he was careless in storing some of the cylinders too close to goods that were dirty, as well as in mislaying others. Thus, though called a complaint in conversion in order to defeat the limitation clause, the complaint states a classic claim for a bailee's negligent damage, not deliberate taking, of goods entrusted to his possession–one of the earliest applications of the concept of negligence in English law.").

19.     The court concludes that CLA is not liable to BSD on the claim for conversion. The court's inventory reconciliation includes negative numbers, a fact which weighs against a conclusion that CLA converted the lumber. Other facts weighing against a finding of conversion are that Pennington had almost unfettered access to BSD's inventory and that BSD requested that it be allowed to break bundles but did not agree to pay to track its inventory on a per-piece basis. The court thus concludes that based on the evidence, CLA did not assume or exercise any right of ownership over the lumber, nor did CLA put the lumber to its own use. CLA merely misplaced the lumber. CLA is thus not liable for conversion.

20.     In a diversity action, state law governs the award of prejudgment interest. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999) (citing *United States v. Dollar Rent A Car Sys., Inc.*, 712 F.2d 938, 940 (4th Cir. 1983)).

21.  South Carolina law "allows prejudgment interest on obligations to pay money from the time
when, either by agreement of the parties or operation of law, the payment is demandable, if
the sum is certain or capable of being reduced to certainty." *Babb v. Rothrock*, 310 S.C. 350,
353, 426 S.E.2d 789, 791 (1993) (citing *S. Welding Works, Inc. v. K & S Constr. Co.*, 286
S.C. 158, 332 S.E.2d 102 (Ct. App. 1985)).  The fact that a sum is disputed does not render
the claim unliquidated for purposes of an award of prejudgment interest.  *Id.* at 353, 426
S.E.2d at 791; *see also GTR Rental, LLC v. DalCanton*, 547 F. Supp. 2d 510, 524 (D.S.C.
2008).  "The proper test for determining whether prejudgment interest may be awarded is
whether or not the measure of recovery, not necessarily the amount of damages, is fixed by
conditions existing at the time the claim arose." *Babb*, 310 S.C. at 353, 426 S.E.2d at 791
(citing 47 C.J.S. *Interest & Usury* § 49 at 124-25 (1982)); *see also GTR Rental*, 547 F. Supp.
2d at 525 ("When an otherwise unliquidated claim is capable of being reduced to certainty
by a simple mathematical calculation, it can be considered liquidated for the purpose of
awarding prejudgment interest.").

22.  The court concludes an award of prejudgment interest is not warranted on the facts of this
case.  The amount of the claim could not be ascertained by a simple mathematical
calculation.  Throughout this litigation, Defendant asserted that it lost *no* lumber at all.
Furthermore, while the three pieces of evidence presented by Plaintiff (Cook's spreadsheet,
the Access printout, and Plaintiff's Exhibit 72) concerning the amount of lumber lost may
be considered reasonably consistent, all reveal different amounts and values of lumber
missing.  Even the method for computing the value of the lost lumber is disputed.  The court
therefore concludes that the method of recovery was not fixed at the time the claim arose.

*See Butler Contracting, Inc. v. Court Street, LLC*, 369 S.C. 121, 134-35, 631 S.E.2d 252, 259 (2006) (concluding the trial court erred in denying the award of prejudgment interest because the amount the contractor owed the subcontractor was a certain sum or capable of being reduced to a certainty based on contractual provisions regarding the amount of the original contract, the amount of change orders approved by the contractor, and payments made by the contractor); *Smith-Hunter Constr. Co. v. Hopson*, 365 S.C. 125, 128, 616 S.E.2d 419, 421 (2005) (affirming an award of prejudgment interest in a breach of contract action because the measure of recovery was fixed at the time the claim arose by the builder's invoices).

23.    In diversity cases, federal law, rather than state law, governs the calculation of post-judgment interest. *Hitachi Credit*, 166 F.3d at 633 (citing *Forest Sales Corp. v. Bedingfield*, 881 F.2d 111, 113 (4th Cir. 1989)).  The court thus concludes that Plaintiff is entitled to an award of postjudgment interest in accordance with 28 U.S.C. § 1961(a).

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that judgment be entered for Builders Source Direct against Cosco Logistics (Americas) Inc. d/b/a IBS Logistics, Inc. in the sum of **$91,382.21** (ninety one thousand, three hundred eighty two dollars and twenty one cents) plus postjudgment interest at the legal rate from the date of this Order.[16]

**AND IT IS SO ORDERED**.

_____
PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**August 12, 2008**

---

[16]Pursuant to 28 U.S.C. § 1961, this rate is 2.23%.

33